Good morning everyone. Our first case this morning is Haynes v. Indiana University. Mr. Betts. May it please the court. Title VII of the Civil Rights Act did not create an exemption for academia. And in this case, there's every reason and all reasons to apply Title VII with the greatest rigor because we are dealing ultimately with the education of our children. And we should not fool ourselves that the layers of review and academia for tenure somehow immune gives immunization to academia from committing discrimination. This is a race discrimination case in which the defendants admit to three undisputed set of facts. The defendants violated their own written procedural rules and broke from academic customs on at least 15 to 20 material points in the tenure application process, including using a racist external review letter that should have been stricken and was said as much by the chairman of the department. Second, the defendants not only excluded African Americans for 100 years, but admitted to their inability to even address their 100 year history of excluding people of color and said that they needed external assistance to assist them with this horrible record of lack of diversity. Three, no African American male was ever on the faculty for the entire time that Dr. Haynes sought tenure and no African American at all voted or made any recommendation in the entire tenure application process that Dr. Haynes went through at Indiana University School of Education. Well, they are African American professors at the university and in the School of Education. You're talking about this specific department? No, I'm talking about the entire 105 member of the School of Education, not just the department, Your Honor, the entire 105 member faculty. Weren't there some African Americans who were brought in with tenure as lateral hires? There were. But they were gone by this time? They were gone by the time Dr. Haynes went through tenure and there were only two in the entire 100 years plus of the history of the School of Education that were brought in and both of those individuals left. We do not have the facts of why they left, but they did leave and they did not retire there. Counsel, can I ask you a question about the timeliness of the Title VII claim? Yes. So, in your client's complaint, it says that he first became aware of the discrimination on or around October 24, 2014? Your Honor, that was an averment, which is not an admission. And once we got into the facts of this very fact complicated case with numerous tangles, we determined that our client had first learned and first claimed of race discrimination in March of 2015. And that is the reality and the facts. That's not an averment. And after he first made the claim in March of 2015 of race discrimination, it was April of 2015, the very next month, that he filed an EEOC claim charged for race discrimination. So, under any theory of equitable tolling, he promptly, more promptly than most race discrimination charges, filed it within a month. Well, unamended averments and pleadings are binding judicial admissions, though. I respectfully disagree. An averment is just that, Your Honor. It's an averment, not an admission. But the cases say otherwise. The cases say that they're judicial admissions unless they're amended. Right. And we did seek to amend and we did the evidence fit the facts that were before us. And the equitable tolling is permitted for our client, that he first learned and first claimed in March of 2015 that there was race discrimination upon getting public records. And in April of 2015, he made his EEOC charge. So, even if it is construed as a judicial admissions, there's still equitable tolling for Dr. Haynes. Ultimately, it doesn't matter because you have your constitutional claim. That's right. Section 1981, Your Honor. And so, that is the backup claim for this case of race discrimination. This case is also based on the internal reports from the School of Education in 2015 and 2012, in which the School of Education itself said that it had the inability to solve its problem of embracing, indeed, excluding people of color and it needed outside help. And it had failed to do that for its long history. Are you talking about the inclusiveness plan? Yes. But that's a sign that they were trying to remedy the problem, right? That they were trying to make diversity hires and become a more welcoming place for people of color. Absolutely. And in 2015 and 2012, they admitted the problem. That is the first step, as we all know, to solving it. And in 2015, 2013 to 2015 was when my client was going through the tenure application problem. But they didn't admit to a problem in intentional discrimination. They admitted to saying, we haven't been able to attract and hire enough qualified black candidates, which is different than admitting to a problem in a discriminatory tenure process. They actually said, Your Honor, in that report, the internal diversity report, that they had a great concern that they were able to solve that challenge. And specifically, Your Honor, said they sought outside assistance to solve that problem. And the problem was embracing people of color. And if you look at the mere fact of the hundred plus year history of the IU School of Education, it had never granted tenure to any African American. And indeed, there was no African American on the faculty in any of the voting tiers in any of the power structure of the entire 105 member faculty of Indiana University School of Education. It was an astonishing fact to learn about this situation. And then that combined with the 15 to 20 violations of their own written rules of procedure that were targeted at Dr. Haynes and exclusively focused on him and not on others. There was no evidence that others had suffered the same 15 to 20 violations. It makes for a resounding case to survive summary judgment. And you put on top of that, that only months before he applied for tenure, he was given an exemplary review in his six year review as to research. And then all of a sudden, he comes up a cropper and the executive associate dean tells the chairperson that this tenure application needs to go down. She put her thumb on the scale before the scale was even built. So my client suffered discrimination in 2013 through and including 2015 in his tenure application process. Well, Dr. Haynes was responsible for choosing the external evaluators on this issue of research. Apparently, there's the three different domains that candidates, tenure candidates are rated in research, teaching, and service. And the requirement for tenure is that the candidate achieve excellence in one of those areas. And they get to choose which one they will make their case for excellence in. And his was research. And then he chose the outside evaluators who were to rate his performance. And that plus the internal review at IU itself didn't come out in his favor. Well, actually, it did. All five external reviewers favored tenure for Dr. Haynes, except for one that was recommended by his chairman and by the dean, the associate dean, who turned out to be unprofessional and racist. And the experts who looked at this said they would have struck that letter as being racist and lacking in total content. And that was an external reviewer who was recommended to him and put on the external review letters by his dean and by his chairman of the department. The applicant for tenure process under the rules of the IU School of Education for the tenure process only permits him to provide three names. It is not so mechanical as you list your three, we'll list our three. It starts out that way. But then when people are busy, people don't feel they have the subspecialty, the field gets dwindled. And then Dr. Haynes has to rely on the goodwill, good faith, and mentorship. That was, in this case, totally void because there was no mentorship or good faith. Indeed, we found out there was anything except good faith. There was bad faith by Dr. Brush, who made stereotyping comments about Dr. Haynes behind his back, we found out through discovery, and said, can the black man even read? He can't communicate. Well, he didn't say, can the black man read? He said, can Haynes? Can Haynes. I didn't see in the record any evidence that anyone said anything like that. He made a stereotype. The man, does the man read the shit he writes, is exactly what he said. And he cannot communicate. A horrible stereotype for an African American male. The typical stereotype in history of African American males in our literature is that they're dumb, lazy, and sexual predators. And that fit into two of those. And the stereotyping was an enormous part of this case. And Dr. Brush fulfilled that. And Dr. Brush was the one who reprimanded Patricia Hardray, who, as her letter turned out, to be racist and lacking in total substance. Can you explain a little bit why that letter was racist? I mean, it seemed she was discussing the positives of him bringing a minority voice. So can you put into context for me your reading of it? Yes, and I can only say what Dr. Greenbaum said, who was a Yale, Harvard, and PhD, and the father of implicit bias, said that it lacked any context. And indeed, her repeated mentioning of Dr. Haynes being African American, as opposed to the other external review letters that simply tried to do an objective evaluation of the scholarship. She repeatedly mentioned his African American nature. And I quote to you, of the very unique specialization of Dr. Haynes of, quote unquote, she said, inclusion. And the tone of it was very clear that inclusion was a derogatory term, meaning diversity. Inclusion is derogatory. Because she says, of the very unique specialization of inclusion by Dr. Haynes, and his identity as an African American scholar, not much is new here. Well, she didn't even have a specialty in his field. So she was not well versed in saying what was new. But her most important thing that this had the undertone of, if not the explicit tone of being racist, was that she makes a derogatory term toward diversity, and repeatedly identifies him as African American, as if that's somehow important. If in writing a case about a burglar who broke into someone's house, and the opinion says, and he was a black man, but there was no reason to identify the individual as a black man, there is at least some racial undertone. Because there's no reason to put, he was a black man that broke into the house. It was a man who broke into the house. But she goes on and says that he is trying to use his African American identity to gain tenure, which there was never any assertion of that other than her own assertion that he was desperate as an African American to become tenured. Mr. Evans. Yes. You're into your rebuttal time. Yes, I am. And unless there's a further question, I will reserve my time for rebuttal. Thank you, counsel. Thank you. Mr. Terrell. Good morning, and may it please the court. Michael Terrell of Taft, Scutinius, and Hollister, and I, along with my co-counsel, Melissa Macchia, represent defendant Indiana University and the individual university defendants. Before I address several of the arguments made by plaintiff's counsel, I want to go over some undisputed facts. Twenty-seven tenured faculty members from across the entire Indiana University Bloomington campus reviewed the plaintiff's application for tenure. Nineteen of those 27 individuals voted or recommended against tenure. At the university level, which is separate and apart from the School of Education, the vote was 9-0 against tenure. In fact, at the university level, the vote was far worse for the plaintiff than at the School of Education, where it was a split vote. Now, after almost two years of litigation, the plaintiff hasn't presented a single piece of evidence that any one of those 19 individuals voted or recommended the way they did because of the plaintiff's race. Indeed, as we sit here today, the plaintiff has absolutely no idea what 18 of those 19 individuals even considered or relied upon in casting their vote or making the recommendation because the plaintiff never conducted any discovery directed at that very information. In addition to those 27 individuals, five members of a faculty board of review, separate and apart from the School of Education, heard the plaintiff's grievance and determined that there were no procedural irregularities with his tenure process. Again, a body separate from the School of Education. And all of these facts are undisputed, and Judge McKinney, District Court Judge Larry J. McKinney, took those undisputed facts and entered summary judgment on behalf of the defendants, and we are here today asking this court to affirm Judge McKinney's decision. Now, before you even get to these alleged irregularities, the plaintiff can overcome two very basic legal hurdles. One, his Title VII claim, as Your Honor alluded to, is barred by the statute of limitations. Equitable tolling doesn't save him. He made a judicial admission, and equitable tolling gives you maybe days, maybe weeks, but not months. And he waited more than five to six months to file his EEOC charge. And his 1981 claim is also barred by sovereign immunity and qualified immunity. But even setting aside those two fatal flaws, the plaintiff cannot possibly meet his evidentiary burden to overcome summary judgment in this case. This court has repeatedly emphasized the extremely high burden on a plaintiff, alleging discrimination in tenure decisions because of the very subjective nature of those types of cases. Here, the plaintiff has no evidence of discrimination. Rather, the plaintiff is asking this court to infer discrimination from various isolated events and incidents that had nothing to do with his race, but more importantly, absolutely no connection to the decision made by the ultimate decision makers. Now, I want to talk about several of the allegations the plaintiff claims Judge McKinney ignored. Now, this is a highly unusual case because the vast majority of the allegations the plaintiff raises are against Dr. Thomas Brush, the chairman of his former department. Now, why is that unusual? Dr. Brush wrote the letter on behalf of the entire department supporting and recommending tenure. But the plaintiff claims Dr. Brush was not enthusiastic enough in his support. Now, it defies all logic that the person who would write the letter on behalf of the department recommending tenure would somehow be working behind the scenes to harm him, and Judge McKinney agreed. Now, the primary attack against Dr. Brush is that, as Plaintiff's counsel alluded to, he recommended two external reviewers that were known to be hard graders. But here are the undisputed facts. The plaintiff and Dr. Brush together selected the original 12. And these two external reviewers, Dr. Hardray and Dr. Gibbons, were not among the original 12. Dr. Brush only got around to recommending those two individuals, along with several others, after eight of the original 12 external reviewers declined to write a review. So to believe plaintiff, you would have to believe Dr. Brush knew somehow eight external reviewers were going to decline to write a review. Regardless, the plaintiff agreed with those two external reviewers. He rejected several others, but accepted those two. It is also undisputed that Dr. Gibbons wrote a favorable letter, and there's no evidence that Dr. Brush knew anything about Dr. Hardray's reputation of being a hard grader. But since when, being a hard grader in a tenure process, is that evidence of racism? And more importantly, there is zero evidence what the ultimate decision makers at IU, the provost, the vice provost, and the president, how much weight they even placed on that. He said, the plaintiff's counsel said that Dr. Hardray's letter was plainly racist. Well, he deposed not the ultimate decision makers, but the voters at the department level, and he asked them about that letter, and not one of them perceived that letter as racist. And he said they gave it the same weight they give any other piece of a dossier. It's one small piece. The plaintiff also likes to direct some of his allegations against, and you heard the plaintiff's counsel allude to it, Dr. Joyce Alexander. She's the former executive assistant to the School of Education. The plaintiff claims that although Dr. Alexander had no vote in the process, she tried to negatively influence the voting. Well, the primary allegation against her is that she went to Dr. Brush and mischaracterized an external review letter and urged him to vote no. Well, there's no evidence she made either of those statements because of the plaintiff's race, but more importantly, Dr. Brush voted yes. So to the extent that's what she wanted to do, she wasn't successful. The plaintiff alludes to the history of the School of Education. The plaintiff claims Judge McKinney ignored evidence that the School of Education has never granted tenure to an African-American male. That's what they say in their papers, male. Well, this isn't a gender discrimination case. It's a race discrimination case, and it's undisputed that the School of Education has granted tenure to at least eight African-American females, at least one African-American male, and they've hired with tenure at least two African-American males. But that's not the important issue here. The question is not how many African-American males have achieved tenure but how many applied and were rejected. We only know of one in the School of Education who was an African-American male who applied and didn't receive tenure, and that's the plaintiff. As this court held in Kuhn v. Ball State, knowing the total number who have received promotion in a protected class without knowing how many in that protected class applied and were rejected is, quote, next to worthless, close quote. In the end, the plaintiff, nothing the plaintiff has cited is evidence of discrimination or pretext. As this court held in Blasdale, a plaintiff in a tenure case who wants to allege discrimination must be able to show, in order to prevail, that the ultimate decision makers relied on someone who is biased. And the words of this court is decisively influence. Here there is no evidence that a single one of those 27 individuals who reviewed the plaintiff's application for tenure were biased, let alone is there any evidence that the ultimate decision makers, vice provost, provost, and President Michael McRobbie were decisively influenced. The ultimate decision makers, I assume, typically defer to the faculty vote, right, the faculty reviewers? Well, in this case we don't know exactly what they did, and so I don't know really the answer to that question. I do know that at the university level of voting it was 9-0, and whether they deferred to that 9-0 vote, which is separate and apart from the School of Education, we don't know because they have not been deposed. There's no evidence in that regard. But the decision making is so diffuse. It starts at the sub-department level, right, at the Information Systems Technology Department within the School of Education, and then it goes to the School of Education. So the initial department said yes. The School of Education said no after submitting it to the process at that level. Multiple inputs there, right? Correct. And then it goes to the larger university where we get even more inputs. And the evidence isn't that anywhere at any of those stages of review that any of those discrete reviewers harbored discriminatory animus. So far as I can tell, there are sporadic allegations, but nothing specific to anybody with a vote. And, Your Honor, that's exactly correct. There is no evidence that any one of the 27 harbored any racial animus in making their decisions. But as I said, even one step removed from that, there's no evidence what the ultimate decision makers even relied upon in making their decisions because there's no evidence to that regard. Dr. Haynes talks about evidence, if not of racial animus, then racial stereotyping on the part of at least a couple of the faculty members with a vote. Would you address that? Dr. Brush, who again wrote the letter recommending the reference there, after seven years of employment, two emails that were a year after the vote, in which he was very critical of the plaintiff for his performance as a faculty member. And he wrote an email expressing his disanger. There is no racist innuendo in that email where he says, does he not read the S he writes? I mean, they can say all they want to that that's somehow a racist email. It's a frustrated chairman of the department who had supported and wrote the letter recommending tenure for the plaintiff, expressing his frustration on this particular individual's performance with a student and the role that the plaintiff was playing with a particular student. So in the Hardrey letter, again, every member who was deposed and questioned on the contents of that letter, no one found anything in that letter to be racist, including those who voted in favor of Dr. Haynes for tenure. Now, not having any evidence of discrimination or pretext, at the lower level the plaintiff tried to submit the expert report of Dr. Laura Perna, and the plaintiff claims that Judge McKinney abused his discretion in striking that report. Well, the plaintiff is wrong. Dr. Perna's report was neither relevant nor reliable under Rule 702 or Daubert. The primary purpose the plaintiff wanted to put in Dr. Perna's alleged expert report was to compare his research record with that of another candidate, Dr. Ann Lethwich, a white female faculty member who received tenure the year before the plaintiff applied. Judge McKinney struck Dr. Perna's expert report for several reasons. First, Dr. Perna admitted she wasn't an expert in the plaintiff's field. One of the irregularities the plaintiff argues about in this case is that the external reviewers were not leaders in his field. Well, they were leaders in his general field, but maybe not his sub-specialty. But their own expert, who they claim has the right to opine on his right to achieve tenure, admitted she wasn't an expert in the plaintiff's area. But more amazingly, Dr. Perna admitted she didn't even read the publications or articles or works by the two people she was comparing. Rather, all she did is a simple mathematic counting exercise of how many articles they wrote, teaching awards, and the total amount of grant money. And Judge McKinney was correct in saying a simple counting exercise does not rise to the level of expert testimony because it doesn't draw upon any specialized knowledge or expertise. Even if you ignore that the simple counting exercise doesn't rise to expert testimony, the courts in this circuit have uniformly held that a plaintiff alleging discrimination in a tenure case cannot substitute the subjective opinion of an expert for that of a tenure committee. What the plaintiff is asking this court to do with Dr. Perna's opinion, and somebody who admitted didn't read the articles, isn't an expert, and simply counted, is to have a veto vote over the 27 individuals who actually considered and ruled upon the plaintiff's tenure application. In addition, allowing Dr. Perna's opinion to create a question of fact would eliminate any university ever again in a plaintiff discrimination tenure case from receiving summary judgment because all you'd have to do is find some tenured faculty member from across the country who would opine that I believe this individual deserves tenure. And finally, even if Judge McKinney allowed into evidence Dr. Perna's opinion, it would not have created a question of fact, and here's why. If you look at her report, even her own counting shows that Dr. Leftwich, the comparator, had 12 peer-reviewed articles to the plaintiff's aid. It shows that Dr. Leftwich had three teaching awards to the plaintiff's two, and most importantly, it showed Dr. Leftwich had $4.1 million in grant money to the plaintiff's $86,000. So even on the face of their own expert report, the plaintiff was not similarly situated to that of Dr. Leftwich. And one final point. In order to achieve tenure at IU, you have to be rated as excellent in a chosen area. The plaintiff chose research. But you also, to achieve tenure, have to be rated at least satisfactory in teaching and service. It is undisputed that the plaintiff was rated below satisfactory at every level of review above the department level. And there is no evidence in the record to be found that any one of those individuals who rated him below satisfactory in teaching did so because of his race. That fact alone dooms his case. And at the university level, the vote on his teaching was 8 to 1, that he did not achieve satisfactory, which is, again, a minimum prerequisite to get tenure. In closing, this is not a discrimination case. Rather, this is a plaintiff that is asking this court to play the role of a tenure committee and grant him tenure. The plaintiff has not presented any evidence of racial bias playing any role among any of the 27 individuals who reviewed his application for tenure. And most importantly, there is absolutely zero evidence that anything that the plaintiff points to, these irregularities that have anything to do with the plaintiff's race or had any connection to the ultimate decision made by the vice provost, the provost, and the president of the university. If there are no questions, I ask this court to please affirm Judge McKinney's order. Thank you very much. Thank you. Mr. Betz, rebuttal. Yes. With all due respect to my opposing counsel, he made a direct misrepresentation to this court. Dr. Perna did read the articles and publications of these individuals. Nowhere in her affidavits, which are two, did she ever say, I did not read the publications. Indeed, she did. But what she was an expert in is what the case law says she should be an expert in. She was in the Department of Education. She did receive a Ph.D. from the University of Michigan, and she was a tenured faculty member for a long time who's testified before Congress at the University of Pennsylvania and is considered the most renowned expert in the tenure process, including the exclusion of African Americans from tenure faculty members because of their race. Because guess what? No African Americans were in any of those 27 seats that they want to tell you was not racist because for 100 years those 27 seats have been filled with white people. And if you're an African American, you say, huh, something's rigged about this system. No African Americans ever get to vote or make a recommendation, and they say, well, they're just all white people. You can't say they're racist. Well, you can when you have implicit bias experts. My opposing counsel said nothing to you about Dr. Anthony Greenewald, who was the father of implicit bias, and he looked at all the facts in this case. With all due respect to the opinion of my opposing counsel that there was no evidence of racism, Dr. Anthony Greenewald, an independent expert who could care less about me, Dr. Haynes, or this case was fully independent, said yes, there was racism involved in this situation, and Dr. Perna, completely independent from this situation, not a faculty member at Indiana University who was looking at what their fellow members of faculty did at the IU School of Education, and Dr. Perna said there was a predetermined decision to deny tenure, and that's why it had racism. One more point. There was reason to believe on a very practical level. Dr. Brush broke from all historical academic protocol at the IU School of Education when he changed the sterile one-paragraph summary of what occurred at the vote of the department. That's all they did was report out minutes. Historically, that's the only thing that was ever sent to the Promotions and Tenure Committee. Dr. Alexander, Dean Alexander, came back to Dr. Brush two months later and said, I need a good three-pager on Dr. Haynes. Never before had that been done in the process of a tenure application, and guess what? Every sentence in that summary of three and a half pages was negative toward Dr. Haynes. He had no chance to rebut that because he was blinded from his own dossier. That was one of the 15 to 20 violations of their own written rules of procedure, and it was all negative. Dr. Brush did write the public recommendation, and we are mocked for saying it wasn't enthusiastic enough because he wrote a negative memo to the Promotions and Tenure Committee as if he were Dr. DeSylvester, which was a fraudulent pursuit. He showed the memo to the Promotions and Tenure Committee as if he were Dr. DeSylvester. Yes, he wrote a memo, Dr. Brush did, and then submitted it to the Promotions and Tenure Committee as if he were Dr. DeSylvester, but he wasn't. He misrepresented himself and wrote a three-and-a-half-page negative review of the vote at the department, and that infected the entire process. So when my opposing counsel makes these wild, broad claims that there is no evidence, yet there's the foremost expert on implicit bias and a renowned tenure process expert who says there was a predetermined decision to deny tenure, my clock says 15 seconds, Your Honor. Actually, your time has expired. Okay, I apologize. If I may end, if that would be okay. Yes, if you could wrap up, please. If those two experts are not enough evidence to show this court that we at least should survive summary judgment, then never will an individual be able to show race discrimination in a tenure review process with a history this deep in exclusion of people of color. All right, thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.